# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.  08-1904

_____

| | | |
|---|---|---|
| UnitedHealth Group Inc., | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Wilmington Trust Co., not in its | * | |
| individual capacity, but solely in its | * | |
| capacity as Indenture Trustee on behalf | * | |
| of all Holders of 5.800% Notes Due | * | |
| March 15, 2036, of UnitedHealth | * | |
| Group Inc., | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted:  November 13, 2008
Filed:  December 1, 2008

_____

Before MURPHY, HANSEN, and RILEY, Circuit Judges.

_____

MURPHY, Circuit Judge.

UnitedHealth Group (UHG) brought suit seeking a declaratory judgment that its failure to file timely reports with the Securities and Exchange Commission (SEC) violated no duties owed to its noteholders.  Wilmington Trust Company (Wilmington Trust), as trustee for certain UHG notes, filed counterclaims asserting violations of the notes indenture, the Trust Indenture Act of 1939, and an implied covenant of good

faith and fair dealing. The parties filed cross motions for summary judgment, and the district court[1] granted judgment in favor of UHG on all claims and counterclaims. We affirm.

I.

The basic facts of this case are undisputed and relatively straightforward. On March 2, 2006, UHG publicly issued $850 million of 5.800% senior notes due March 15, 2036 (the notes). The notes were issued pursuant to an indenture entered into by UHG and the Bank of New York as trustee. As trustee, the Bank of New York was charged with enforcing, as necessary, the indenture provisions against UHG. Throughout the life of the notes, UHG has made all required interest payments and the debt has continuously been rated investment grade.

As a publicly traded company, UHG is required to make periodic financial disclosures, including quarterly filings on SEC form 10-Q. See Securities and Exchange Act of 1934 (Exchange Act) §§ 13, 15(d), 15 U.S.C. §§ 78m, 78o(d). UHG came under public scrutiny in 2006 for backdating employee stock options by using the benefit of hindsight to assign option grant dates retroactively in order to reflect the most favorable historical market values. In response to public concerns about this practice, UHG formed a committee of independent directors to study its financial affairs. Because of this ongoing review, UHG failed to file its 2006 second quarter form 10-Q (2Q 10-Q) by its August 9 due date. Under such circumstances, SEC regulations require a delinquent filer to submit a form 12b-25 notification of late filing. 17 C.F.R. § 240.12b-25. UHG complied with this requirement on August 10. The company's 12b-25 filing explained the reasons for the delay and was accompanied by a 44 page appendix containing substantially the same information as

---

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

the company would have included in a timely form 10-Q. A copy of this filing was forwarded to the trustee on August 14.

On August 25, 2006, a notice of default was sent to UHG on behalf of certain hedge funds which collectively owned more than twenty five percent of the outstanding principal balance on the notes. The notice claimed that UHG's failure to file a timely 2Q 10-Q violated § 504(i) of the trust indenture. That section reads as follows:

> So long as any of the Securities remain Outstanding, the Company shall cause copies of all current, quarterly and annual financial reports on Forms 8-K, 10-Q and 10-K, respectively, and all proxy statements, which the Company is then required to file with the [Securities and Exchange] Commission pursuant to Section 13 or 15(d) of the Exchange Act to be filed with the Trustee and mailed to the Holders of such series of Securities at their addresses appearing in the Security Register maintained by the Security Registrar, in each case, within 15 days of filing with the Commission. The Company shall also comply with the provisions of TIA [Trust Indenture Act] ss. 314(a).

(emphasis added). At the very least, § 504(i) requires that UHG forward to the indenture trustee copies of the company's required financial reports within fifteen days of actually filing such reports with the SEC. The notice of default claimed that § 504(i) also imposed an affirmative duty to file timely reports with the SEC and that UHG's failure in that regard constituted a default under the indenture. The notice gave UHG sixty days to cure the default.

UHG publicly disclosed the notice of default in an SEC form 8-K filing. The company asserted it was not in default and intended to defend itself against the allegation. In mid October, the company filed another form 8-K in which it reported the findings and recommendations of the review committee and added that it was still

digesting the report and had not yet determined if it needed to restate its past financials. It further announced it would delay filing a third quarter 10-Q.

On October 25, 2006, UHG filed this action against the Bank of New York as trustee,[2] seeking a declaratory judgment that it had not violated the terms of the indenture by failing to file a timely 2Q 10-Q. Shortly thereafter, on October 30, the hedge funds caused a notice of acceleration to be served on UHG. The notice observed that UHG had not cured the alleged default under § 504(i) and, based on that failure, demanded accelerated payment of the full principal amount of the notes. Effective January 18, 2007, Wilmington Trust Company succeeded the Bank of New York as trustee and was substituted as the defendant. On January 26, 2007, Wilmington Trust counterclaimed for breach of contract, violation of the Trust Indenture Act of 1939 (TIA) § 314(a), 15 U.S.C. § 77nnn(a), and breach of an implied covenant of good faith and fair dealing.

UHG finally filed its 2Q 10-Q on March 6, 2007, almost seven months late. It simultaneously submitted an amended form 10-Q for the first quarter of 2006, a tardy form 10-Q for the third quarter of that year, and a form 10-K for the year ending December 31, 2006. The financial information contained in the 2Q 10-Q differed by less than one percent from the preliminary data which had accompanied the August form 12b-25 notice of late filing.

Both parties filed cross motions for summary judgment. The district court granted summary judgment in favor of UHG on all claims and counterclaims. Wilmington Trust now appeals, arguing the district court erroneously construed UHG's contractual and statutory duties. UHG urges that we affirm the district court.

---

[2]The registered holder of the note, Cede and Co., was also initially named as a defendant but was later voluntarily dismissed.

II.

We review de novo the district court's grant of summary judgment. Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). Summary judgment is proper where there are no genuine issues of material facts and the moving party is entitled to judgment as a matter of law. Id. Here the basic facts are undisputed, and the outstanding issues are purely legal questions of contract interpretation and statutory construction. Resolution of the issues by summary judgment was therefore appropriate.

Section 1306 of the indenture provides that its terms "shall be governed by and interpreted under the laws of the State of New York." Under New York principles of contract interpretation, "[t]he words and phrases used by the parties must . . . be given their plain meaning." Brooke Group Ltd. v. JCH Syndicate 488, 663 N.E.2d 635, 638 (N.Y. 1996); see also Whitebox Convertible Arbitrage Partners, LP v. IVAX Corp., 482 F.3d 1018, 1021 (8th Cir. 2007).

III.

Wilmington Trust advances three main arguments, all of which relate to UHG's failure to file a timely 2Q 10-Q. According to Wilmington Trust, this failure violated UHG's obligations under § 504(i) of the indenture, TIA § 314(a), and an implied covenant of good faith and fair dealing. We examine each in turn.

A. Section 504(i) of the Indenture

Wilmington Trust argues that § 504(i) of the indenture imposes an independent obligation on UHG to file timely SEC reports and, within fifteen days afterwards, to forward copies of such reports to the trustee. Under the Trust's interpretation, when UHG failed to file its 2Q 10-Q on time, it not only ran afoul of the Exchange Act and

SEC regulations, but it also violated the indenture duties to its noteholders. UHG asserts that § 504(i) imposes no independent obligation to make timely SEC filings. Rather, the provision merely requires the company to transmit to the trustee copies of whatever reports it <u>actually</u> files with the SEC. Based on this analysis UHG maintains that its indenture obligations were not even triggered until March 2007 when it finally filed its tardy 2Q 10-Q. Since the company forwarded a copy to Wilmington Trust within fifteen days of actual filing, UHG argues that it has not defaulted under the indenture.

Section 504(i), reduced to its essence, reads as follows: "the Company shall cause copies of . . . financial reports . . . which the Company is then required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act to be filed with the Trustee . . . within fifteen days of filing with the Commission." Wilmington Trust argues that the plain meaning of the phrase "then required to file" imposes an independent obligation to file timely reports. Wilmington Trust correctly notes that the word "then" means "at that time." But for our purposes the word's placement and function within the sentence are just as important as its definition.

In § 504(i) the phrase "then required to file" is part of a longer clause introduced by the relative pronoun "which." The antecedent of "which" is clearly and unambiguously the word "reports." Thus, as a simple matter of syntax, the phrase "then required to file" modifies the word "reports" and indicates <u>which</u> reports are subject to § 504(i)'s terms. Just as clearly and just as unambiguously, the phrase "within fifteen days of filing with the Commission" modifies "shall cause . . . to be filed" and indicates <u>when</u> § 504(i)'s command must be fulfilled. The plain meaning of § 504(i) thus imposes only a relative time constraint: copies of the indicated reports must be forwarded to the trustee within fifteen days of actually filing them with the SEC. The clause imposes no absolute timetable or independent obligation to comply with the Exchange Act or SEC regulations. In fact, the plain language of § 504(i) makes clear that any duty actually to file the reports is imposed "pursuant to Section

13 or 15(d) of the Exchange Act" and <u>not</u> pursuant to the indenture itself. The provision does not incorporate the Exchange Act; it merely refers to it in order to establish which reports must be forwarded.

Wilmington Trust also argues that New York law, while respecting the plain meaning of words and phrases, further requires that "primary attention must be given to the manifest purpose" of the parties. <u>In re Herzog</u>, 93 N.E.2d 336, 339 (N.Y. 1950). Wilmington Trust notes that in the Internet age, SEC filings are readily available online through the agency's EDGAR database. Based on this fact it maintains that a ministerial duty to forward copies of widely available reports would be meaningless and of no value to noteholders. The purpose of the provision, Wilmington Trust asserts, must therefore be to impose an independent obligation to file timely reports. Wilmington Trust ignores the origin of § 504(i), however. As UHG points out, the language is derived from a Model Simplified Indenture drafted by the American Bar Association in 1983. <u>See</u> 38 Bus. Law. 741, 755 (1983). At the time the model provision was promulgated, the Internet did not exist as we know it today. The fact that § 504(i) may be of slight value in the Internet age does not empower Wilmington Trust to impose unbargained for duties on UHG simply to breathe new relevance into an outdated provision.

UHG notes that another model indenture agreement <u>does</u> incorporate the SEC filing deadlines. A 1967 proposal prepared by the American Bar Foundation requires that an issuer "will . . . file with the Trustee, within 15 days after the Company is required to file the same, copies of the [reports]." This language differs from that of § 504(i) in at least one critical respect: § 504(i)'s fifteen day window opens when the company <u>actually</u> files its reports with the SEC, while the 1967 model's fifteen day window opens when the company is <u>required</u> to file regardless of when it actually does. The parties in this case are sophisticated and represented by teams of experienced attorneys. They could have chosen the 1967 ABF model over the 1983 ABA model, or they could have drafted their own language imposing a rigid timetable

or explicitly incorporating SEC regulations. But, as the district court found, "this is not the agreement they made." UnitedHealth Group Inc. v. Wilmington Trust Co., 538 F. Supp. 2d 1108, 1114 (D. Minn. 2008).

The precise issue in this case is a matter of first impression in the Eighth Circuit. It has recently been presented to three federal district courts and to a New York State trial court. Although none of the decisions of these courts is binding on us, we note that the three federal courts all concluded, on nearly identical facts, that similar indenture provisions did not impose independent obligations to file timely SEC reports. See Finisar Corp. v. U.S. Bank Trust Nat'l Ass'n, No. C 07-4052, 2008 WL 3916050 (N.D. Cal. Aug. 25, 2008); Affiliated Computer Servs., Inc. v. Wilmington Trust Co., No. 3:06-CV-1770-D, 2008 WL 373162 (N.D. Tex. Feb. 12, 2008); Cyberonics, Inc. v. Wells Fargo Bank Nat'l Ass'n, No. H-07-121, 2007 WL 1729977 (S.D. Tex. June 13, 2007).

In an unpublished opinion, the commercial division of the New York trial court reached the opposite conclusion. Bank of N.Y. v. BearingPoint, Inc., No. 600169/06, 2006 WL 2670143 (N.Y. Sup. Ct. Sept. 18, 2006). The BearingPoint court rejected a debt issuer's argument that a similar indenture provision made "SEC filings optional under the Indenture." Id. at *7. The court's analysis focused on the mandatory language of the indenture but did not distinguish between two distinct duties: one to file reports with the SEC in the first instance and another to forward copies of the reports to the trustee. More importantly, the court did not consider any timing issues and simply eliminated the phrase "within 15 days after it files such . . . reports . . . with the SEC," replacing it with a set of ellipses.

The Finisar, Affiliated Computer Services, and Cyberonics courts all considered and rejected BearingPoint, as did the district court in this case. They did so after coming to the same conclusion: the indenture provisions at issue imposed nothing more than the ministerial duty to forward copies of certain reports, identified by

reference to the Exchange Act, within fifteen days of actually filing the reports with the SEC. As previously discussed, the clear and unambiguous language of the indenture in this case leads to the same conclusion. We therefore decline to follow BearingPoint.

Based on the plain meaning of § 504(i), we hold that the indenture imposes no independent obligation to file timely SEC reports. UHG's delay in filing its 2006 2Q 10-Q—while potentially a violation of SEC regulations—did not constitute a default under the indenture. Since UHG did ultimately file with the SEC its "then required" reports and within fifteen days afterwards did transmit to the trustee copies of the same, it fulfilled its contractual duties.

## B. TIA § 314(a)

The Trust Indenture Act provides in part as follows:

> Each person who . . . is or is to be an obligor upon the indenture securities covered thereby shall: (1) file with the indenture trustee copies of the annual reports and of the information, documents, and other reports . . . which such obligor is required to file with the [Securities and Exchange] Commission pursuant to [§ 13] or [§ 15(d)] of [the Exchange Act] . . . .

TIA § 314(a), 15 U.S.C. § 77nnn(a). The TIA therefore imposes on UHG a statutory obligation to provide copies of required SEC reports to the indenture trustee. The provision is obviously closely related to § 504(i) of the indenture, and in fact § 504(i) expressly incorporates the provisions of TIA § 314(a).

Nevertheless, the TIA imposes no new obligations or duties and is actually less burdensome than § 504(i) of the indenture insofar as it imposes no time constraints whatsoever. While the indenture creates a relative deadline of fifteen days after actual

filing with the SEC, the TIA is completely silent as to when copies of SEC reports must be forwarded to the trustee. As was the case with § 504(i) of the indenture, the TIA's reference to §§ 13 and 15(d) of the Exchange Act merely identifies which reports must eventually be forwarded to the trustee. It does not independently impose any particular timetable for filing nor does it incorporate the SEC's regulatory deadlines.

As before, Wilmington Trust argues that a ministerial obligation without a corresponding duty to file timely reports is meaningless in today's world of instant Internet communication, particularly in light of the TIA's stated purpose to provide "adequate current information" to investors. See TIA § 302(a)(4), 15 U.S.C. § 77bbb(a)(4) (emphasis added). But the TIA was drafted in 1939. Under the circumstances of that era, the dissemination of "adequate current information" was certainly advanced by a ministerial duty to forward financial reports. What seems redundant in the 21st Century was once a critical mechanism for keeping investors informed as to a company's financial health. The development of more efficient electronic alternatives is no reason to expand UHG's duties under the TIA.

Wilmington Trust next maintains that the SEC has itself interpreted TIA § 314(a) to impose an independent obligation to file timely reports. For this argument, Wilmington Trust relies on SEC Rule 19a-1, 17 C.F.R. § 260.19a-1. Following the indictment of accounting firm Arthur Andersen, the SEC drafted Rule 19a-1 to provide guidance to companies once audited by that firm. In the wake of Andersen's implosion, the SEC created a temporary safe harbor allowing the firm's previous clients to file unaudited financials with their quarterly and yearly reports. Rule 19a-1 merely clarifies that such unaudited filings would also satisfy the TIA: a company "that files with the indenture trustee those Exchange Act reports filed with the Commission in accordance with [the temporary safe harbor] has met its duty under Section 314(a)(1) of the [TIA]." 17 C.F.R. § 260.19a-1(c). Thus, Rule 19a-1 merely indicates that what is good enough for the Exchange Act is good enough for the TIA.

There is no indication that the TIA imposes any separate or independent obligation to file timely reports with the SEC.

The Northern District of Texas addressed this same issue in <u>Affiliated Computer Services</u> and rejected Wilmington Trust's argument for the same reason. Although the New York trial court held otherwise in <u>BearingPoint</u>, its reasoning was not persuasive. We conclude that TIA § 314(a) requires only that debt issuers forward to their trustees copies of such reports as are actually filed with the SEC. Since UHG ultimately filed all required reports with the agency and promptly forwarded copies of the same to the trustee, the company violated no statutory duties under the TIA.

## C. Covenant of Good Faith and Fair Dealing

New York recognizes an implied covenant of good faith and fair dealing in every contract. The covenant "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." <u>Filner v. Shapiro</u>, 633 F.2d 139, 143 (2d Cir. 1980). Wilmington Trust argues that UHG's failure to file its 2Q 10-Q on time left investors in the dark for many months. In fact, UHG seemed to acknowledge as much in a December 2006 form 8-K: "Because we are not current with our filings with the SEC, investors in our securities do not have the information required by SEC rules regarding our business and financial condition with which to make decisions regarding investment in our securities."

On the other hand, as the district court noted, UHG undertook to provide as much information as it reasonably could under the circumstances. It submitted a form 12b-25 notice of late filing which offered its best—albeit uncertified—estimates regarding its then current financial position. These estimates differed by less than one percent from the certified 2Q 10-Q which UHG ultimately filed in March 2007. UHG also provided to investors current updates on its backdating investigation through form 8-K filings in October and December of 2006. We conclude that UHG took all

reasonable and necessary steps to provide its noteholders with as much information as possible and as accurately as possible. More importantly UHG continued to make all required payments on the notes. We conclude therefore that UHG acted prudently and responsibly with respect to its investors and that the company's delay in filing a certified 2Q 10-Q breached no express or implied covenant of the indenture agreement.

## IV.

UHG was indisputably delinquent in filing its form 10-Q for the second quarter of 2006. Nonetheless whatever duties UHG might have neglected were imposed by the SEC and the Exchange Act and not by the indenture or the TIA. UHG's obligation to its noteholders was simply to forward to the trustee copies of the required SEC reports within fifteen days of actually filing them. UHG's late filing therefore did not amount to a default on the notes. Moreover in all cases UHG diligently forwarded to the trustee copies of its required reports within fifteen days of actually submitting them to the SEC. Consequently, UHG has met all of its contractual and statutory duties, and the noteholders are not entitled to accelerated payments. The judgment of the district court is affirmed.

---